# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **DEBORAH J. MAYNARD,** | : | |
| **Plaintiff,** | : | **Case No. 2:07-cv-794** |
| **v.** | : | **Judge Holschuh** |
| **ASHLAND, INC., et al.,** | : | **Magistrate Judge Abel** |
| **Defendants.** | : | |
| | : | |

## MEMORANDUM OPINION & ORDER

Plaintiff Deborah J. Maynard filed suit against her former employer, Ashland Performance Materials ("Ashland Performance") and its parent company Ashland, Inc. ("Ashland"), alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* This matter is currently before the Court on Defendants' motion for summary judgment. (Doc. 35). For the reasons stated below, Defendants' motion is granted.

## I.      Background and Procedural History

Plaintiff Deborah Maynard was hired by Defendant Ashland, Inc. in March 1999 as a Customer Service Representative ("CSR"). (Pl. Dep. at 116-17). In her role as a CSR and later as a Senior CSR, Plaintiff was responsible for coordinating the details of customer orders through communications with the sales representatives and the purchasing client. (Id. at 145-46). Between November 2004 and October 2006, Ashland eliminated at least three positions within Plaintiff's department. Plaintiff approached her supervisors about her increasingly heavy workload and compounded stress level, but little changed to alleviate her concerns. (Pl. Dep. at 213-21; Nye Dep. at 38-39, 189-90).

On Thursday, October 5, 2006, Plaintiff reported to work at her usual time of 8:00 a.m. Plaintiff has described that day as being "extremely stressful" because, in addition to her usual responsibilities, Plaintiff was scheduled to spend two hours "shadowing" another CSR, and was also covering the workload of an absent colleague. (Pl. Dep. at 226-28). Her frustration was exacerbated when, after processing an unexpected rush change order from a large client early that afternoon, she received a phone call from that client's sales representative and a plant employee who "went off" on Plaintiff, causing Plaintiff to become "very emotional." (Id. at 240-42).

Plaintiff entered the cubicle of her supervisor, Saul Lugo ("Lugo"), who was on the phone. (Lugo Dep. at 115-16; Pl. Dep. at 242). She placed a stack of unfinished orders on his desk, and told him that he "had to find somebody to do these orders because I quit." (Pl. Dep. at 242-43). Judy McCray ("McCray"), another employee who was in Lugo's cubicle at the time, observed Plaintiff drop the stack of orders on Lugo's printer and say, "Here are my orders. I'm out of here." (Lugo Dep. at 114-18; Pl. Dep. at 242; McCray Aff. ¶ 4).

Lugo quickly ended his telephone call, and he and McCray followed Plaintiff to her work station. (Lugo Dep. at 117-20; McCray Aff. at ¶ 5). Plaintiff was packing up photographs of her children and grandchildren. (Pl. Dep. at 247). Plaintiff also allegedly told co-workers that they could take any personal items she left behind. (Patterson Aff. at ¶ 6). She slammed her desk drawers and said, "It's not worth it," "I'm finished," "I'm leaving," and "I'm not taking it anymore." (Lugo Dep. at 120-21; McCray Aff. at ¶ 6; Patterson Aff. at ¶ 5). Plaintiff maintains that she told Lugo that she "was having chest pains and that [she] wasn't feeling well" and wanted to go home. (Pl. Dep. at 245). Lugo and Dorothy Lyles-Patterson ("Patterson"), a coworker who witnessed the conversation, deny that Plaintiff mentioned anything about chest pains. (Lugo Dep. at 160;

2

Patterson Aff. ¶ 10).

As they followed Plaintiff to the door, Lugo and Patterson urged her to reconsider. Lugo suggested that Plaintiff take the rest of that day and the following day as sick leave. (Lugo Dep. at 129, 134-136, 143-44; Patterson Aff. at ¶ 8; Pl. Dep. at 252). According to Lugo, Plaintiff replied, "No, I don't need it. . . I'm done." (Lugo Dep. at 144). Likewise, Patterson stated that Plaintiff refused Lugo's offer. "[S]he knew what she wanted to do and that she would not be coming back because she was quitting. Her intentions were very clear." (Patterson Aff. ¶ 8). Lugo asked permission to call Plaintiff the next day to make sure that this was her final decision; Plaintiff eventually agreed to let him call her. (Lugo Dep. at 146; Patterson Aff. at ¶ 9; Pl. Dep. at 252).

Lugo returned to his desk and immediately contacted Human Resources Manager Holly Ross ("Ross") to report that Plaintiff had quit and walked out, but had agreed that he could call her the next day. (Lugo Dep. at 149-51; Ross Dep. at 121, 144-45, 164-66). Ross told Lugo to document the events of that afternoon and to inform HR Connection, Ashland's umbrella Human Resources department, of Plaintiff's voluntary termination. (Ross Dep. at 165, 80-81; Lugo Dep. at 151; Ex. D to Mot. Summ. J.).

As promised, Lugo called Plaintiff the morning of Friday, October 6th. (Pl. Dep. at 269; Lugo Dep. at 157). The parties have different recollections of the contents of that phone call. According to Lugo, in response to his question about whether Plaintiff had reconsidered, Plaintiff said that quitting was "the best decision I ever made." (Lugo Dep. at 157-58). Plaintiff denies telling Lugo that quitting was the best decision she ever made. (Pl. Dep. at 271). Plaintiff testified that she told Lugo that she "was sorry for having a meltdown and making a scene," but that she "was feeling better." She told him that she had scheduled a doctor appointment for Tuesday, October 10th

and wanted to make sure everything was okay before she returned to work. (Id. at 274). The parties

agree that she provided Lugo with her passwords so that he could access her computer and phone.

(Lugo Dep. at 158; Pl. Dep. at 272).

Following his phone call with Plaintiff, Lugo documented the events of October 5th and 6th,

as instructed by Ross. He wrote, in part:

> As Debbie was walking out of the area I asked her again if she
> wanted to make this decision, she yes [sic]. I offered to let her take
> the rest of the day as sick time, and if she wanted to take Friday as a
> sick day to think about her decision she could she said commented
> [sic] to the fact that she was done with Ashland and did not accept
> my offer.
>
> I asked her if I could call her Friday to talk about her decision and
> she said I could if I wanted to.
>
> On Friday at approximately 10:05 I was able to talk with her about
> her decision, at that time she calm [sic] and seemed quite relaxed, I
> asked her if she wanted to stick with her decision and she basically
> indicated that has [sic] made the right decision and did not want to
> reconsider her decision.

(Ex. to Lugo Dep.).

Within an hour after speaking to Plaintiff on October 6th, Lugo advised HR Connection that

Plaintiff had quit. (Ex. E to Lugo Dep.). Lugo instructed another employee to change Plaintiff's

voicemail prompt and to enable an out-of-office automatic email response. That response stated that

Plaintiff "will be out of the office starting 10/6/2006 and will not return until 10/20/06." (Ex. 1 to

Pl.'s Mem. in Opp'n to Summ. J.). Lugo explained in his deposition that this was meant as a

temporary fix for the benefit of customers and others who were trying to reach her. As soon as

Plaintiff's termination was fully processed, her email would be disconnected completely. (Lugo

Dep. at 194-98, 207-09).

On October 6th, Customer Service Manager Carol Nye, who had been out of town, learned that Plaintiff had quit. (Nye Dep. at 150-51). She left a voice mail message for Plaintiff, asking her to call if she wanted to talk. (Id. at 159). Plaintiff returned Nye's call on October 8th. They discussed Plaintiff's frustrations with the workload and some of her coworkers. Nye thought that it would be helpful to document these issues so she asked Plaintiff to come in for an "exit interview." (Id. at 163-65, 169-72). Nye also asked Holly Ross to attend. (Ross Dep. at 155-56; Nye Dep. at 167). Plaintiff agreed to meet with Nye on October 10th after her doctor appointment. However, she denies that Nye called the meeting an "exit interview." (Pl. Dep. at 174). Plaintiff testified that she understood that they were meeting to decide how to resolve the problems with her workload so that appropriate changes could be made when she returned to work. (Id. at 276-78, 280-81).

Plaintiff met with her doctor, Scott W. Johnson, M.D., on Tuesday, October 10, 2006 early in the morning. She reported suffering from short term memory loss, difficulty with concentration, insomnia, fatigue, anxiety, depression, and stress-related symptoms. (Johnson Aff. ¶ 3). Johnson diagnosed Plaintiff with stress-related reactive disorder associated with multiple symptoms of anxiety and depression. (Id. at ¶ 4). He prescribed Paxil for the anxiety and depression, and signed a prescription order for a four-week leave of absence from work. (Id. at ¶¶ 4-5; Ex B).

Immediately following that doctor appointment, Plaintiff went to Ashland's facility to retrieve FMLA certification paperwork. She left copies of Dr. Johnson's order for Carol Nye and Holly Ross. She also left a voice mail message for Nye, letting her know that she would not be able to attend the meeting they had scheduled for later that morning. (Pl. Dep. at 158-62; Nye Dep. at 181-82; Ross Dep. at 137-38).

Plaintiff completed the FMLA paperwork and faxed it to Barbara Robinson, Ashland's FMLA Coordinator. (Pl. Dep. at 162-63, 167, 174-75). Robinson received Plaintiff's application on October 12, 2006. Plaintiff sought a four-week leave of absence beginning on October 6, 2006. Robinson concedes that she took no action because, according to Ashland's records system, Plaintiff had voluntarily quit on October 5, 2006, making her ineligible for FMLA benefits. (Robinson Dep. at 97-99). On October 14, 2006, Plaintiff received a letter from Ross denying the request for medical leave. The letter stated that Plaintiff was ineligible for FMLA leave because her employment with Ashland had ended on October 5, 2006. (Ross Dep. at 115-16; Pl. Dep. at 293). Plaintiff then instituted this suit alleging violations of the FMLA.

## II.     Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy,

39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover

Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material

fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided,

summary judgment is appropriate if the opposing party fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party will bear

the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that

"there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418,

422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and
> supported, an opposing party may not rely merely on allegations or
> denials in its own pleading; rather, its response must -- by affidavits
> or as otherwise provided in this rule -- set out specific facts showing
> a genuine issue for trial. If the opposing party does not so respond,
> summary judgment should, if appropriate, be entered against that
> party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is

insufficient; there must be evidence on which the jury could reasonably find for the opposing party.

Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to

demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v.

Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter

summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the

nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy,

Inc., 39 F.3d at 1347.

**III.     Analysis**

The Family and Medical Leave Act ("FMLA") was enacted to provide job security and help employees "balance the conflicting demands of work and personal life." Price v. City of Fort Wayne, 117 F.3d 1022, 1024 (7th Cir. 1997); see also 29 U.S.C. § 2601(b). The FMLA states in relevant part that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

The Sixth Circuit has recognized "two distinct theories of recovery under the FMLA." Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004). The first is the "interference" or "entitlement" theory. It is based on 29 U.S.C. § 2615(a)(1), which states "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." To recover on an "entitlement" claim, a plaintiff must prove that: (1) she is an eligible employee, as defined in 29 U.S.C. § 2611(2); (2) defendant is a covered employer, as defined in 29 U.S.C. § 2611(4); (3) she was entitled to take leave under the FMLA; (4) she gave adequate notice of her intent to take leave; and (5) defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights. Hoge, 384 F.3d at 244.

The second theory of recovery involves "retaliation" or "discrimination" claims. These arise under 29 U.S.C. § 2615(a)(2), which prohibits employers from discharging or discriminating against employees who oppose unlawful FMLA practices. "Retaliation" claims are subject to the burden-shifting analysis set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Absent direct evidence of retaliation, a plaintiff can establish a prima facie case by proving that: (1) she exercised rights available under the FMLA; (2) she suffered an adverse employment action; and

9

(3) there was a causal connection between the two.  Gibson v. City of Louisville, 336 F.3d 511, 513 (6th Cir. 2003).  The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  The plaintiff must then prove, by a preponderance of the evidence, that the proffered reason is pretextual.  Id.

Plaintiff has asserted both theories in her complaint.  In their motion for summary judgment, Defendants raise only one argument with respect to both claims.  Defendants maintain that because Plaintiff voluntarily quit her job on October 5, 2006, and was no longer an employee on October 10, 2006 -- the date she requested FMLA leave -- she was not entitled to FMLA leave.  In addition, because she quit before she requested FMLA leave, it cannot be said that Defendants retaliated against her for attempting to exercise her rights under the FMLA.  Defendants argue that because Plaintiff was not eligible for FMLA leave, both claims fail as a matter of law.  See Penson v. Autozone Stores, Inc., No. 1:06CV140, 2006 WL 3097213, at *2 (N.D. Ohio Oct. 30, 2006) (holding that because plaintiff was terminated before he requested FMLA leave, he was no longer eligible for FMLA leave); Brohm v. JH Properties, Inc., 149 F.3d 517, 523 (6th Cir. 1998) (same); Green v. Burton Rubber Processing, Inc., 30 F. App'x 466, 471 (6th Cir. 2002) ("Once Green was discharged, he was no longer an employee, and he was thus not entitled to leave under the FMLA.").

Plaintiff acknowledges that this case turns on the question of whether she quit prior to the date she requested FMLA leave.  She argues, however, that genuine issues of material fact preclude summary judgment on this issue.  The Court disagrees.  Based on the evidence presented, no reasonable jury could find that Plaintiff was still employed by Defendants on the date she requested FMLA leave.  Defendants are therefore entitled to judgment as a matter of law on both of Plaintiff's

FMLA claims.

Plaintiff admits that on October 5, 2006, she "regrettably" told Saul Lugo that she "quit." She packed up her personal belongings and walked out. (Pl. Dep. at 242-49). Before she left, Lugo and Patterson asked her to reconsider her decision and suggested that she take the rest of that day and the following day as sick leave. However, Plaintiff replied, "No, I don't need it. . . I'm done." (Lugo Dep. at 129, 134-136, 143-44). Lugo, McCray, and Patterson all believed that, based on Plaintiff's statements and her conduct, she had no intention of returning to work at Ashland. (Lugo Dep. at 121, 150, 173; McCray Aff. ¶ 8; Patterson Aff. ¶ 8). Moreover, Lugo acted consistent with his belief that Plaintiff's decision was final. He testified that when he returned to his desk after walking Plaintiff to the door, he immediately contacted Holly Ross in Human Resources to report that Plaintiff had quit. (Lugo Dep. at 149; Ross Dep. at 121, 164-65). Ross instructed him to document what had happened and told him to contact HR Connection to report Plaintiff's resignation.

Plaintiff now denies that she quit on October 5th. She maintains that Lugo and Patterson convinced her to rethink her decision before she left that day. (Pl. Dep. at 263). Lugo offered to let her take the rest of that day and the following day as sick leave (Lugo Dep. at 135, 143), and Patterson cautioned her against making such an important decision while she was so upset. (Pl. Dep. at 252). Plaintiff explained:

> After speaking with both Saul and Dorothy, I mean, they both calmed me down enough to just make me realize that even though I wanted to go home because I was having a meltdown and crying, that I had the option to just leave and come back the next workday, and Saul told me he would call me the next day. "Just go home and get some rest, call me tomorrow, and we'll see what we need to do and how much time you need to take." He was very nice and very considerate about it. And Dorothy was very caring and concerned about me also.

11

> . . . So it's my understanding when I left that everything had been resolved and we would get together tomorrow and I could take the next day off. . . in my mind, I thought we were all on the same page. I thought Dorothy and Saul and I all understood that when I left I was going to go home and get some rest, I could take the next day off, and he was going to call and talk to me, and I assumed at that point that it would be about the stress, and the workload, and making some changes to fix the problem.

(Id. at 264-66). Plaintiff admitted at her deposition, however, that the conversation she had with Lugo before she left was "subject to interpretation" and that it was possible that Lugo and Patterson had a different "perspective" on the question of whether her decision was final. (Id. at 266).

In the Court's view, Plaintiff's interpretation of what transpired is not necessarily unreasonable. Lugo did urge her to reconsider her decision, did offer her a couple of days off, and did ask if he could call her the next day to further discuss the matter. By the time she left, Plaintiff could have reasonably believed that the door was still open and that she could return to Ashland if she changed her mind. Lugo's conduct also gives rise to an inference that he thought that Plaintiff might reconsider after she calmed down. When Lugo called Ross to report that Plaintiff had walked out, he told Ross that he was planning to call Plaintiff the next day. (Lugo Dep. at 151). The Court also notes that Lugo did not immediately notify HR Connection of Plaintiff's resignation. He waited until after he talked to Plaintiff the next day. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the issue concerning the finality of Plaintiff's resignation was not completely resolved on October 5th.

Nevertheless, based on the evidence presented, no reasonable jury could find that Plaintiff was still employed by Defendants after what transpired on October 6th. At approximately 10:05 that morning, Lugo called Plaintiff as he had promised he would. According to Lugo, the purpose of that call was to see if she had reconsidered her decision to quit. (Lugo Dep. at 156). Lugo testified that

12

Plaintiff said that quitting was the best decision she had ever made and she would not reconsider. (Id. at 157-58). Accordingly, at 10:44 that same morning, Lugo called HR Connection to report Plaintiff's resignation. He spoke to Vicki Schultz. Her notes from that phone call indicate that Lugo had called Plaintiff that morning "to confirm that she would be back on Monday. She said that she has had enough and is done." (Ex. E to Mot. Summ. J.). Schultz listed Plaintiff's last day of employment and her effective termination date as October 5, 2006. (Id.).

Plaintiff denies telling Lugo that quitting was the best decision she ever made. (Pl. Dep. at 271). She initially testified that she told him that she was feeling better and "did want to return to work," but had a doctor's appointment on Tuesday. (Id. at 269). However, when pressed, she admitted that she was not sure if she specifically told Lugo that she wanted to return to work. Rather, she just "assumed that he knew" that she planned to return to work sometime after her doctor's appointment. (Id. at 274).

Plaintiff's subjective belief that she had communicated her intent and her desire to return to work following her doctor's appointment is insufficient to create a genuine issue of material fact in this case. It is obvious that Lugo ended that phone call firmly convinced that Plaintiff had made up her mind and had no intention of coming back. Within the hour, he contacted HR Connection to report Plaintiff's resignation. The Court notes that Lugo had no reason whatsoever to lie about the fact that Plaintiff had told him that her decision to quit was final. It is undisputed that Plaintiff was a valued employee; this is why Lugo had urged her to take some time to reconsider her decision. If she had, in fact, told him -- or even hinted -- that she had changed her mind and planned to return to work after all, he would not have called HR Connection to report her resignation. Under the circumstances presented here, no reasonable jury could find that Plaintiff did not abandon her job

prior to seeking FMLA leave.

Discrepancies concerning what transpired after Lugo reported Plaintiff's resignation on October 6th, including the question of whether Carol Nye asked Plaintiff to come in for an "exit interview," are irrelevant. Likewise, the fact that Lugo later asked a coworker to enable an auto response on Plaintiff's email stating that Plaintiff was "out of the office starting 10/6/2006 and will not return until 10/20/06" (Ex. 1 to Pl.'s Mem. in Opp'n to Summ. J.), does not create a genuine issue of material fact concerning whether Plaintiff remained employed after October 6th. Lugo testified that he did not instruct the coworker to enter a specific end date. He explained that this automatic response was meant as a temporary fix. As soon as Plaintiff's termination was fully processed, the email would be disconnected completely. (Lugo Dep. at 194-98, 207-09).

In short, Plaintiff resigned from her position no later than October 6, 2006. Based on the evidence presented, no reasonable jury could find otherwise. Although Plaintiff may now regret her decision, her claims are not legally viable. Because Plaintiff was no longer employed on October 10, 2006, the date she applied for FMLA leave, she was not eligible for the leave she requested. Defendants properly denied her application and are entitled to summary judgment on her entitlement claim.

Plaintiff's retaliation claim is even weaker. Because it is undisputed that Defendants processed Plaintiff's termination on October 6, 2006, several days before she applied for FMLA leave, the requisite causal connection cannot be shown. Accordingly, Plaintiff is not able to establish a prima facie case of retaliation.[1] Defendants are, therefore, also entitled to summary

---

[1] The Court need not reach the issue of pretext or the application of the "honest belief" rule cited by Defendants.

judgment on the retaliation claim.

In summary, viewing the evidence in a light most favorable to the Plaintiff, the Court concludes that there is no genuine issue of material fact with respect to either claim. No reasonable jury could find that Plaintiff was eligible for FMLA leave when she submitted her application on October 10, 2006, or that Defendants retaliated against her because she submitted that application. Defendants are therefore entitled to summary judgment as a matter of law on both FMLA claims.

## IV.    Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (Doc. at 35) is **GRANTED**.

**IT IS SO ORDERED.**

Date: December 10, 2009                    **/s/ John D. Holschuh**
                                           John D. Holschuh, Judge
                                           United States District Court